Filing # 259327850 E-Filed 10/15/2026 06:49:19 PM

**IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT**
**IN AND FOR SARASOTA COUNTY, FLORIDA**
**CIVIL DIVISION**

GG YACHTS INC., a Foreign Profit Corporation d/b/a Engel & Völkers Yachting; and PAUL BENSON, an individual,

CASE NO.:
DIV.:

Plaintiffs,

vs.

ARNOLD'S OFFICE FURNITURE, LLC, a Pennsylvania Limited Liability Company and JAY BERKOWITZ, an individual,

Defendants.
_______________________________________/

**VERIFIED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

COMES NOW Plaintiffs, GG YACHTS INC., d/b/a Engel & Völkers Yachting ("E & V Yachting"), and PAUL BENSON ("Mr. Benson", collectively, "Plaintiffs") by and through their undersigned counsel, hereby brings this action against Defendants, ARNOLD'S OFFICE FURNITURE, LLC ("Arnold's"), a Pennsylvania Limited Liability Company and JAY BERKOWITZ ("Berkowitz"), an individual, and alleges as follows:

**JURISDICTION AND VENUE**

1. This is an action for Declaratory Judgment, Breach of Contract, Defamation, Tortious Interference with Business Relationships, and Temporary and Permanent Injunctive Relief.

2. Plaintiffs have suffered damages in excess of $50,000.00, exclusive of interest, attorney's fees and costs.

3. Plaintiff, GG YACHTS INC., d/b/a Engel & Völkers Yachting is a California Corporation with its principal place of business (and main office) in Sarasota County, Florida.

4. Plaintiff, PAUL BENSON, is an adult over the age of eighteen, and a resident of the State of Utah, and is otherwise *sui juris*.

5. Defendant, JAY BERKOWITZ is an adult over the age of eighteen, who is believed to be a resident of New Jersey, and upon information and belief is otherwise *sui juris*.

6. Defendant, ARNOLD'S OFFICE FURNITURE, LLC, upon information and belief, is a Pennsylvania limited liability company with its principal place of business in Bridgeport, Pennsylvania.

7. Defendant, ARNOLD'S OFFICE FURNITURE, LLC, upon information and belief, regularly engages in interstate commerce in Florida, markets its business to Floridians, and services customers in Florida.

8. Venue is proper in Sarasota County, Florida pursuant to the Purchase and Sale Agreement attached as **Exhibit A** (the "PSA"), as well as the pursuant to section 47.011, Florida Statutes, because the causes of action accrued in Sarasota County.

9. This Honorable Court has jurisdiction over Mr. Berkowitz, pursuant to the PSA, and as to Arnold's pursuant to § 48.193, Fla. Stat. (as upon information and belief, Arnold's operates, conducts, engages in, and carries on business ventures in Florida; is engaged in substantial and not isolated activity within Florida; and has sufficient minimum contacts in Florida).

## GENERAL ALLEGATIONS

### Background and Berkowitz's Purchase of the Vessel

10. The yacht brokerage industry in the United States is highly lucrative, in that a single purchase/sale of a yacht can involve six to eight figure purchase prices, and significant commissions for the broker who markets the yacht and effectuates the purchase / sale.

11. The yacht brokerage industry in Florida involves billions of dollars in transactions each year.

12. Given that the transactions in the yacht brokerage industry involve the buying and selling of highly sophisticated and complex vessels by high net-worth individuals, the business of yacht brokering is highly dependent on trust, honesty, ethics and reputation.

13. As detailed herein, Berkowitz sought to leverage this reality against the Plaintiffs by threatening to publicly call into question Plaintiffs' honesty and ethics, in order to try to induce Plaintiffs to agree to void his yacht purchase transaction, when Plaintiffs have no obligation to do so.

14. As detailed herein, Berkowitz was a party to a yacht transaction where he agreed to buy, and ultimately did buy, a fishing vessel from Mr. Benson which was brokered by E & V Yachting.

15. Following an unfortunate fuel-leak incident after he took possession of the vessel, Berkowitz ultimately had buyer's remorse and went on a campaign of defamation, threats, and statements completely untethered to the truth. Further, Berkowitz made, and continues to make, a series of statements misrepresenting the nature of the transaction and the PSA.

16. During the June 28, 2026 through July 1, 2026 timeframe, Mr. Berkowitz (the buyer), Mr. Benson (the seller), and Mr. Justin Cohen (President of E & V Yachting, the broker), agreed to the terms in, and executed, the PSA in connection with Berkowitz's purchase of a thirty-nine foot 2023 Fishing Raptor 390 Solarium yacht (the "transaction" and the "Vessel", respectively) bearing Hull No: FIS39034J223.

17. A true and correct copy of the PSA is attached hereto as **Exhibit A.**

18. As clearly shown in the PSA, the Parties to the PSA (Berkowitz, Benson, and E & V Yachting) all agreed to the following provisions:

A) BUYER WARRANTS AND REPRESENTS THAT HE IS NOT RELYING ON ANY ADVERTISEMENTS, PROMISES, DESCRIPTIONS, AFFIRMATIONS, OR REPRESENTATIONS (WHETHER ORAL OR WRITTEN, PRIOR TO OR CONTEMPORANEOUS WITH THIS

> AGREEMENT) PROVIDED BY THE BROKER. UPON CLOSING, IT IS UNDERSTOOD THAT THE BUYER HAS ACCEPTED THE VESSEL IN ITS "AS IS" CONDITION. NO WARRANTY, EITHER EXPRESS OR IMPLIED, AND NO REPRESENTATION AS TO THE CONDITION OF SAID VESSEL, ITS FITNESS FOR ANY PARTICULAR USE OR MERCHANTABILITY, HAS BEEN GIVEN OR IS BINDING UPON BROKER, ALL OF WHICH ARE DISCLAIMED.
>
> PSA at ¶ 10.

B) There would be no warranty supplied by the Plaintiffs on the Vessel. PSA at ¶ 14.

C) The PSA supersedes "all prior and contemporaneous negotiations, agreements, representations, warranties, and understandings pertaining thereto, be it written, oral, or otherwise." PSA at ¶ 16.

D) "Buyer and Seller hereby jointly and severally indemnify and hold the Broker harmless from any and all third party claims, demands, causes of action, losses, liabilities, damages and judgments, arising in connection with the Broker's undertaking pursuant to the terms and conditions of this Agreement. Should Broker become a party to any litigation involving this Agreement, Broker shall be reimbursed for its costs and attorney's fees, at all pretrial, trial and appellate levels, by the party or parties found to have breached this Agreement. If any term, condition, or provision of this Agreement is held to be unenforceable for any reason, it shall, if possible, be interpreted to achieve the intent of the parties to this Agreement to the extent possible rather than avoided."

> *Id.*

E) "This Agreement may not be amended or modified, except in writing, signed by both parties." *Id.*

19. After signing the PSA, Berkowitz eventually elected to go ahead and close on the transaction to buy the vessel.

20. In connection with the closing, Berkowitz remitted $220,000 (in addition to the $5,000 deposit he had already paid), and took possession of the vessel in Sarasota, Florida.

<u>The Attempted Voyage to St. Petersburgh</u>

21. After Berkowitz took possession of the vessel in Sarasota, he later asked Mr. Cohen to accompany him on the vessel on a voyage from Sarasota to a marina in St. Petersburgh, Florida.

22. As a favor to Berkowitz, Mr. Cohen agreed to accompany Mr. Berkowitz on the voyage in his personal capacity.

23. On September 11, 2026, Berkowitz and Cohen setoff on the voyage to St. Petersburgh.

24. At the beginning of the journey, the vessel appeared to be operating normally.

25. Later, Berkowitz and Cohen became aware that fuel apparently began to leak into the bilge (*i.e*., the area under the main deck) of the vessel.

26. The presence of fuel in the bilge of the vessel presented a potential environmental hazard, as well as a fire danger (although this was not an acute risk given the lack of inboard engines).

27. After discovering fuel in the bilge, out of an abundance of caution, Berkowitz and Cohen shut the vessel's engines down and contacted the United States Coast Guard as well as the vessel towing service known as "Sea Tow". Berkowitz and Cohen eventually departed the vessel and left it in the care of Sea Tow.

28. Upon information and belief, Mr. Berkowitz's vessel was then towed to a marine facility by Sea Tow.

29. Upon information and belief, rather than properly handle the care, remediation, repairs, and disposition of his vessel following the incident described above, Berkowitz elected to hail a ride-sharing service and travel by car to the airport and leave town.

30. The current disposition of Mr. Berkowitz's vessel is unknown to Plaintiffs as of the filing of this Complaint.

31. Upon information and belief, Berkowitz may have disclaimed his interest in the vessel and may have essentially abandoned the vessel at Sea Tow.

32. Upon information and belief, if the vessel remains with Sea Tow, it is incurring significant storage charges, and Sea Tow may eventually have the legal right to auction the vessel off to satisfy these charges, if they are not paid by Berkowitz.

Berkowitz's Actions Following the Aborted Voyage

33. Following the incident[1]/ aborted voyage, Berkowitz and Arnold's launched a campaign of false statements, unsupported legal threats, and defamation against the Plaintiffs ("Berkowitz's defamation campaign").

34. The gist of Defendants' defamation campaign was to falsely and publicly claim to anyone that would listen that the Plaintiffs had represented to Berkowitz that the vessel was being sold to him with a warranty from the Plaintiffs, and that Plaintiffs promised to perform under said warranty, and they failed to live up to said promises.

35. Berkowitz also made false public statements to anyone that would listen that E & V Yachting and Mr. Benson expressly promised him a warranty, and that E & V Yachting and/or Mr. Benson knew of undisclosed issues with the vessel and must "take responsibility" for the vessel and take ownership of Berkowitz's vessel, because he was displeased with the yacht.

36. The statements, allegations, and assertions Berkowitz made during his ongoing defamation campaign are completely untethered to the clear contractual terms in the PSA, where, *inter-alia*, it was made clear to Berkowitz that there was no Broker or Seller supplied warranty.

37. Berkowitz's defamation campaign includes both false and defamatory reviews posted to the internet as well as false and defamatory mass emails to business partners of E & V

[1] The aborted voyage to St. Petersburgh is referred to as the "incident" herein.

Yachting and other businesses around the world that share the "Engel & Völkers" name. *See* composite **Exhibit B**[2] and **Exhibit C**[3], respectively.

38. Berkowitz's defamation campaign is not just limited to online reviews containing false and defamatory claims against E & V Yachting. In an effort to disrupt E & V Yachting's business partnerships and cast doubt upon the stellar reputation associated with the "Engel & Völkers" brand, Berkowitz intentionally and with malice posted false and defamatory reviews to public web pages associated with other Engel & Völkers entities that have nothing to do with the yacht brokerage business and instead are associated with real estate. *See* Ex. B at p. 3.

39. Berkowitz made clear that he would continue to send repeated, arguably harassing, emails containing falsehoods over and over again to Plaintiffs (and other entities that share the E & V name), he could put pressure on Plaintiffs to take the vessel back.

40. Prior to the filing of this action, on October 4, 2026 Plaintiffs informed Berkowitz that his online reviews contained false statements of fact that constitute actionable defamation and formally requested that he delete the false and defamatory statements online.

41. Instead of retracting or deleting his online reviews containing the false factual assertions, Berkowitz doubled down and posted them in more places across the internet, in order to inflict the most possible business damage to E & V Yachting. *See* dates of posts indicated on Ex. B, *generally*.

42. Berkowitz also informed Plaintiffs' representatives that he would utilize Arnold's personnel to assist with, and carry out, his defamation campaign, and attached a spreadsheet listing all of the different cities and consumer-review websites (sixty-five (65) listings in total, including

---

[2] This composite exhibit contains a sample of the some of the defamatory posts Berkowitz has publicly published on the internet.

[3] Upon information and belief, Berkowitz sent the same (or substantially) similar email as the one displayed in Exhibit C many different times to many different people, in an effort to defame Plaintiffs to as many possible people as he could.

Google, Yelp, the Better Business Bureau, Trustpilot, Facebook, and multiple boating and yachting forums, in Sarasota, Naples, Annapolis, Newport Beach, and Sausalito) on which he and his "team" intended to post the false and defamatory reviews, all the premised on the non-existent warranty coverage from Plaintiffs. Berkowitz announced that his "full-time personal executive assistant" could "spend the next two weeks" identifying such sites and posting the reviews "wherever it is permitted." *See* **Exhibit C**.

Berkowitz's Threats to Harm Plaintiffs' Business Unless Plaintiffs Rescinded the PSA

43. From the outset, Berkowitz's defamation campaign was not an effort intended to honestly share a consumer experience. It was an attempt at improperly and unscrupulously gaining leverage to force the recission of a contract that Berkowitz had no right to. Berkowitz expressly and repeatedly threatened to injure Plaintiffs' business and reputation—through online reviews and communications to Engel & Völkers entities around the world—unless Plaintiffs agreed to rescind the PSA, take the Vessel back, and return Berkowitz's $225,000.00 purchase price, relief to which Berkowitz had no right under the PSA or Florida law. *See* Ex. C.

44. On September 14, 2026, after Mr. Benson advised Berkowitz in writing that the Vessel had been "marketed and sold as a preowned boat" and that Plaintiffs did "not wish to re-purchase" it, Berkowitz responded that he would "be making a full report and sending it to the main headquarters of the Engel & Völkers worldwide real estate and yachting divisions, specifically to all top officials of record," and would "put up reviews on local and National levels on the Internet." *Id.*

45. The next day, September 15, 2026, Berkowitz made the *quid pro quo* explicit: "You have 48 hours to cancel my contract and return my funds or we will move full force ahead with our mission to expose this disaster of a transaction . . . and report this to every authority and review

source possible as well as contact the main office of Engles and Volkers [sic] worldwide real estate and yachting." *Id.*

46. On September 16, 2026, Berkowitz wrote to Engel & Völkers' senior executives and corporate legal department (copying Plaintiffs) that if his demand for the return of his funds "remain[ed] unresolved," his "next step" would be to "share [his] experience through appropriate online review platforms." *Id.* Berkowitz's contrived version of events in all instances were based on, and rooted in, the clear falsehood that Plaintiffs warrantied the vessel.

47. From September 29, 2026 through October 4, 2026, Berkowitz and Arnolds sent a series of emails to Plaintiffs and other parties in a smear campaign based on clear falsehoods and unsupported demands, and also posted a series of baseless, blatantly false online reviews. *See* Exs. B and C.

48. Each iteration of Berkowitz's defamation campaign—the online reviews (Ex. B) and the mass emails (Ex. C is but one example)—rests on the same core false statements of fact (collectively, the "False Statements"), namely that: (a) E & V Yachting and/or Mr. Benson provided or promised they would provide Berkowitz with a warranty on the Vessel; (b) E & V Yachting and Mr. Benson have refused to honor that purported seller and/or broker backed warranty; (c) Mr. Benson's description of the Vessel as "used" and sold "as is" was a post-incident reversal, in "complete contradiction" of the representations and documentation Berkowitz received when he purchased the Vessel; (d) Plaintiffs knew of and concealed a defect in the Vessel's fuel system, were "clearly negligent," and are now "hiding facts"; and (e) as a result of the foregoing, Plaintiffs are dishonest and unethical, have "not stood behind the vessel or the Engel & Völkers brand," and prospective customers should "proceed with extreme caution" before doing business with them, because of these false facts, assertions, and implications.

49. Each of the False Statements are blatantly and clearly false, and Berkowitz knew they were false when he made them. This has been pointed out to Berkowitz and he claims he will continue the false smears in an attempt to force E & V Yachting to buy the vessel back or agree to rescind the purchase contract.

50. Berkowitz signed, and initialed every page of, the PSA, which states in capital letters that the Vessel was accepted "AS IS," that "NO WARRANTY, EITHER EXPRESS OR IMPLIED . . . HAS BEEN GIVEN," that no warranties were transferred to Berkowitz, and that the PSA supersedes all prior representations and may be amended only by a writing signed by both parties. PSA at ¶¶ 10, 14, 16.

51. On August 12, 2026—after his survey and trial run—Berkowitz executed an Amendment to the PSA extending the acceptance and closing dates and confirming that "[a]ll other terms and conditions of said Agreement remain unchanged." *See* Ex. A.

52. Berkowitz's own correspondence confirms his knowledge: on September 15, 2026, he cited the very provision of the Florida Uniform Commercial Code (section 672.316, Florida Statutes) under which conspicuous "as is" language excludes implied warranties, and on October 3, 2026, he acknowledged that Plaintiffs "used 'as is' language in the contract." *See* Ex. C. Berkowitz's threats were not made to vindicate any legitimate right. Berkowitz had no right under the PSA or Florida law to rescind the transaction, to return the Vessel, or to demand a refund of the purchase price, and Plaintiffs had told him so. The threats were made to improperly compel Plaintiffs to do what the PSA did not require—and what Plaintiffs had refused to do—by holding Plaintiffs' business reputation hostage. Berkowitz's malice is clear when he repeatedly reiterated that he fully intended to injure Plaintiffs' business, and said as much: "I don't care how much money I have to spend . . . ." "Time is not an obstacle here." *Id.*

53. Berkowitz has also fed Sea Tow the same lies, falsehoods and defamatory statements detailed above, including the blatantly false assertion that Plaintiffs own or are "responsible" for the vessel (and its retrieval from Sea Tow). Sea Tow is an important industry partner of Plaintiffs and thus reputational harm is especially acute here. Moreover, the Defendants exhaustive online crusade to harm Plaintiffs as much as possible is ongoing, and Plaintiffs expressly reserve the right to supplement these general allegations and causes of action to account for further ongoing defamatory conduct by the Defendants, as is revealed by Plaintiffs' investigation and the discovery process within this action.

54. Plaintiffs have been significantly harmed by the Defendants as a result of the above acts, omissions, torts, defamation, and inequitable conduct.

**COUNT I – DECLARATORY JUDGMENT**
(E & V Yachting and Mr. Benson Against Berkowitz)

55. Plaintiffs E & V Yachting and Mr. Benson re-allege and reaffirm paragraphs 1 through 54 of the Complaint as if fully incorporated herein.

56. This is an action for declaratory relief under Chapter 86, Florida Statutes, including sections 86.011 and 86.021, which authorize this Court to declare rights, status, and other equitable or legal relations arising under a written contract, and to determine any question of construction or validity arising under such contract.

57. Pursuant to all applicable law, and common law, Berkowitz assumed to title to the vessel when the vessel was physically delivered to him on September 11, 2026.

58. Risk of loss passed to Buyer upon his receipt of the Vessel.

59. Buyer accepted the Vessel within the meaning of section 672.606, Florida Statutes, and section 672.607(2) bars any rejection after acceptance. Buyer has no basis to revoke acceptance under section 672.608, Florida Statutes, because the Vessel was sold "as-is," without warranty, and no nonconformity exists that could support revocation.

60. The PSA, including (but not limited to) the As-Is title and the warranty disclaimers within the PSA exclude all implied warranties, including the implied warranties of merchantability and fitness for a particular purpose, under section 672.316(2) and (3)(a), Florida Statutes.

61. No express warrant warranty exists on the vessel. The PSA contains no warranty regarding the vessel's mechanical condition, and the PSA's integration clause makes the PSA the parties' complete and exclusive statement of their terms. Under section 672.202, Florida Statutes, Buyer may not contradict the Agreement with evidence of any prior or contemporaneous oral promise, including the alleged warranty. Further, neither Seller nor Broker made any such promise.

62. There is a bona fide, actual, present, and practical need for a declaration. Berkowitz's repudiation of ownership leaves the vessel's ownership and responsibility for it in doubt, and exposes Plaintiffs to claims by Berkowitz (and potentially third-parties), who may treat Plaintiffs as responsible for charges and liabilities that belong to Berkowitz. Plaintiffs' rights depend on the construction of the Agreement and the application of Florida law to the facts alleged.

63. The parties have actual, present, adverse, and antagonistic interests, all interested persons are before the Court, and the relief sought is not merely legal advice.

64. Despite Berkowitz's statements suggesting otherwise, Plaintiffs have no responsibility as to the care for, or remediation to, the vessel, and are entitled to a declaratory judgment as to same.

WHEREFORE, Plaintiffs, GG YACHTS INC, d/b/a Engel & Völkers Yachting, and Mr. PAUL BENSON, respectfully request that this Honorable Court enter a judgment:

(a) declaring that title to and ownership of the vessel passed to Berkowitz at closing on September 11, 2026, and thus Berkowitz is the sole legal and equitable owner of the vessel;

(b) declaring that risk of loss passed to Berkowitz upon his receipt of the vessel, and that Berkowitz is solely responsible for the vessel, including all towing, storage, repair, and related charges arising after closing;

(c) declaring that Berkowitz accepted the vessel "as-is" at the time of closing, and has no right to reject or revoke acceptance of it;

(d) declaring that the vessel was sold "as-is," that the PSA excludes all express and implied warranties, and that neither Seller nor Broker owes Berkowitz any warranty coverage as to the vessel;

(e) declaring that the PSA's plain terms, and all applicable Florida law, bar Berkowitz from relying on any alleged oral warranty;

(f) granting supplemental relief under section 86.061, Florida Statutes, as necessary or proper to enforce the declaration;

(g) awarding Plaintiffs their costs under section 86.081, Florida Statutes, and reasonable attorney's fees under the terms of the PSA; and

(h) granting such other and further relief as this Honorable Court deems just and proper.

**<u>COUNT II – BREACH OF CONTRACT</u>**
(E & V Yachting Against Berkowitz)

65. Plaintiff E & V Yachting re-alleges and reaffirms paragraphs 1 through 54 of the Complaint as if fully incorporated herein.

66. As reflected in the PSA, the Parties all agreed, *inter-alia*, that E & V Yachting would be held harmless in connection with any claims associated with Berkowitz's purchase of the Vessel.

67. Following Berkowitz's receipt of the vessel, and the incident, he made clear to the other parties that he was not going to honor the PSA's hold harmless language, in that *inter-alia*, he would repeatedly demand that Plaintiffs take the vessel back, repeatedly demand that the "as-is" nature of the PSA be ignored, and repeatedly demand that Plaintiffs honor a non-existent warranty supposedly provided by Plaintiffs.

68. Instead, Berkowitz decided to do the opposite to what he agreed in the PSA in that he would attempt to hold E & V Yachting responsible for the condition of the vessel, the charges associated with the incident (and subsequent storage costs), and to generally completely disregard the "As-Is" language he agreed to in the PSA.

69. Further, Berkowitz's attempts to, improperly and without a legal basis, rescind the PSA constitutes a breach of the PSA according to the Florida UCC and common law.

70. All of the above breaches of the PSA have harmed E & V Yachting.

**WHEREFORE**, the GG YACHTS INC, d/b/a Engel & Völkers Yachting respectfully requests that this Honorable Court enter a judgment in their favor and against Berkowitz for damages, including pre-judgment and post-judgment interest, attorneys' fees, and grant such other relief that this Honorable Court deems proper and just.

**COUNT III – DEFAMATION *PER SE* (PUBLIC INTERNET POSTS)**

(E & V Yachting and Mr. Benson Against Berkowitz and Arnold's Office Furniture, LLC)

71. Plaintiffs re-allege and reaffirm paragraphs 1 through 54 of the Complaint as if fully incorporated herein.

72. This is an action for defamation brought against Mr. Jay Berkowitz and the Pennsylvania office furniture company he controls, Arnold's Office Furniture, LLC.

73. Berkowitz and Arnolds, with malice, carried out a campaign of publicly publishing and posting false and defamatory online reviews to all sorts of internet websites associated with entities bearing the name "Engel & Völkers" in order to harm E & V Yachting and Mr. Benson. *See* **Exhibit B**.

74. The reviews presented the following false statement of fact in connection with Berkowitz's purchase of the vessel: "Engel & Volkers Yachting / GG Yachts also provided a warranty". *See Id.* Each online review then goes on to provide a narrative that attempts to portray Plaintiffs as not honoring this non-existent warranty.

75. These false and defamatory online reviews were intended to harm Plaintiffs' and Plaintiffs' business interests in that they portray Plaintiffs as dishonorable and unethical businesses and business people.

76. In addition to the false assertion that Plaintiffs "provided a warranty," the online reviews published by Berkowitz and Arnold's contain the following additional false statements of fact, each of which is of and concerning E & V Yachting and Mr. Benson: (a) that Mr. Benson's statement that the Vessel "was a used boat sold 'as is'" was "[a] complete contradiction of facts based upon the representations and documentation provided to [Berkowitz] when [he] purchased the vessel" (it was not, this was clearly an as-is deal); and (b) that "Engel & Völkers Yachting / GG Yachts and its CEO have not stood behind the vessel or the Engel & Völkers brand." *See* Ex. B. In the version of the review that Berkowitz announced he would post on sixty-five additional listings, he added, in an attempt to corroborate the false warranty claim, that Plaintiffs "refuse[] to take any responsibility." *See* Ex. C.

77. Each of these statements is false. The "documentation provided to [Berkowitz] when [he] purchased the vessel" is the PSA, which Berkowitz signed and initialed on every page and which states—in capital letters—that the Vessel was accepted "AS IS," that no warranty, express or implied, was given or transferred from the Plaintiffs, and that the PSA supersedes all prior representations. PSA at ¶¶ 10, 14, 16. Far from being a "contradiction," Mr. Benson's post-incident description of the transaction was a recitation of the contract Berkowitz had signed. As alleged in paragraphs 33 through 53 above, Berkowitz knew these facts when he published the false and defamatory reviews.

78. Alternatively, to the extent any individual statement in the reviews is literally true, the reviews as a whole—through their juxtaposition of facts, their omission of the PSA's express "as is" and no-warranty terms, and their characterization of Plaintiffs' adherence to the PSA as a refusal to "stand behind" the Vessel—create the false and defamatory implication that Plaintiffs sold Berkowitz a warranted vessel and then dishonestly reneged on their obligations. Nothing

could be further from the truth. Nonetheless, Berkowitz intended and endorsed that implication, which is precisely the "gist" of each review, and it is actionable as defamation by implication.

79. Berkowitz's "recommend[ation] that anyone considering doing business with Engel & Völkers Yachting / GG Yachts proceed with extreme caution," and his assertion that Plaintiffs have "not stood behind the vessel or the Engel & Völkers brand," are not protected expressions of pure opinion. They are explicit and definitive conclusions expressly premised upon the false statements of fact described above and are therefore actionable.

80. The False Statements are defamatory *per se* because they impute to E & V Yachting and Mr. Benson conduct, characteristics, and a condition incompatible with the proper exercise of their lawful business, trade, and profession—namely, dishonesty, bad faith, and a refusal to honor commitments in an industry that, as alleged above, depends entirely on trust, honesty, ethics, and reputation—and because they tend to injure Plaintiffs in their trade and profession and to subject them to distrust, contempt, and disgrace. These factors are heightened by the realities of the reputation-driven yacht brokerage industry, which Defendants fully knew when they undertook the defamation campaign. Damages are therefore presumed as a matter of law.

81. Berkowitz and Arnold's published the reviews to third parties by posting them on publicly accessible internet review platforms, including the Google Business Profile for the "Engel & Völkers Sarasota" real estate office (Ex. B), where they have been, and continue to be, read by members of the public, by prospective customers of E & V Yachting, and by persons affiliated with the Engel & Völkers brand, including persons located in Sarasota County, Florida.

82. Berkowitz is the Chief Executive Officer of Arnold's. Berkowitz carried out the review campaign using Arnold's email systems and domain and with the assistance of Arnold's personnel (his "team"), including his executive assistant, whom Berkowitz announced he would deploy to identify review platforms and post the reviews, and who was copied on the

communications attached as Exhibit C. Arnold's, acting through its Chief Executive Officer and through employees acting within the course and scope of their employment and at the express direction of Arnold's Chief Executive Officer, authorized, directed, participated in, and ratified the publication of the reviews, and is liable for them jointly and severally with Berkowitz. Berkowitz apparently felt that if he made clear that the weight of his company was behind his defamation campaign, his baseless demands to Plaintiffs that they allow him to return the vessel would be headed.

83. Berkowitz and Arnold's published the reviews with actual malice—with knowledge that the False Statements were false or, at a minimum, with reckless disregard for their truth or falsity—and, in any event, negligently. Berkowitz had the PSA in hand; he had been told by Mr. Benson in writing, repeatedly, that the Vessel was sold "as is" and that no repurchase would occur; and he had been notified by Plaintiffs' on September 29, October 1, and October 4, 2026 that the reviews were false and defamatory. He gave no concern to this, and went ahead and published, republished, and expanded the false reviews anyway, for the admitted purpose of inflicting maximum reputational and business harm on Plaintiffs in order to coerce a rescission to which he was not in any way entitled. *See* Ex. C.

84. At all material times, Berkowitz knew he had executed the PSA and agreed to purchase the vessel without a warranty from Plaintiffs, and went ahead with public statements of purported fact that clearly contradict this, and were false and defamatory.

85. The factually false reviews concern businesses and a business person located in, and doing business in, Sarasota County, Florida, and were posted on websites accessible in, and accessed from, Florida. Berkowitz's and Arnold's publication of the reviews therefore constitutes the commission of a tortious act within the State of Florida.

86. As a direct and proximate result of the false and defamatory reviews, E & V Yachting and Mr. Benson have suffered, and continue to suffer, damages, including injury to their reputation and standing in the yacht brokerage industry and within the Engel & Völkers organization, loss of goodwill, loss of existing and prospective customers and brokerage opportunities, the cost of responding to inquiries from Engel & Völkers affiliates and prospective customers, and the expense of mitigating the harm caused by the reviews, in an amount to be proven at trial but well in excess of $50,000.00.

87. All conditions precedent to the maintenance of this action have been performed, have occurred, or have been waived, including any pre-suit notice required under section 770.01, Florida Statutes, which Plaintiffs provided to Berkowitz on October 4, 2026, more than five days before the filing of this action.

**WHEREFORE**, Plaintiffs, GG YACHTS INC., d/b/a Engel & Völkers Yachting, and PAUL BENSON, respectfully request that this Honorable Court enter judgment in their favor and against Defendants, JAY BERKOWITZ and ARNOLD'S OFFICE FURNITURE, LLC, jointly and severally, for defamation *per se*, awarding Plaintiffs their damages (including general damages presumed by law and all special damages proven at trial), pre-judgment and post-judgment interest, costs, and attorneys' fees as permitted by the PSA and applicable law, and granting such other relief as this Honorable Court deems proper and just.

**COUNT IV – DEFAMATION *PER SE* (MASS EMAILS)**

(E & V Yachting and Mr. Benson Against Berkowitz and Arnold's Office Furniture, LLC)

88. Plaintiffs re-allege and reaffirm paragraphs 1 through 54 of the Complaint as if fully incorporated herein.

89. This is an action for defamation *per se* against Berkowitz and Arnold's arising from a series of mass emails that Berkowitz, using Arnold's email systems and personnel, sent to third parties beginning on or about September 14, 2026 and continuing through at least October 4, 2026

(the "mass emails"). True and correct copies of an example of one of the mass emails is attached as Ex. C.

90. The recipients of the mass emails included, among others: (a) an Engel & Völkers Group Co-Chief Executive Officer; (b) Engel & Völkers' corporate legal department and general corporate mailboxes in the United States and Europe, through which Berkowitz directed that his communications be delivered to Engel & Völkers' Group Co-Chief Executive Officers and to the President and Chief Executive Officer of Engel & Völkers Americas; (c) Engel & Völkers Yachting offices in Bodrum, Turkey, Porto Montenegro, and the French Riviera, each a separately operated business that shares the "Engel & Völkers" name with E & V Yachting; (d) the manager of Sea Tow's Sarasota office and Sea Tow's outside counsel; and (e) Berkowitz's insurance broker. *See* Ex. C. None of these recipients is a party to the PSA, and each is a third party to whom the mass emails were published with an intent to defame Plaintiffs.

91. Berkowitz forwarded the same (or substantially similar) email each time to the expanding audience described above on September 29, 2026 and again on October 4, 2026. *See* Ex. C.

92. The mass emails contain, among others, the following false statements of fact of and concerning E & V Yachting and Mr. Benson: (a) in the September 14, 2026 email: that Plaintiffs were "clearly negligent in many areas of this transaction, as well as hiding facts now to bolster [their] story,"; (b) in the September 15, 2026 email addressed to Engel & Völkers' senior executives and corporate legal departments: that "E&V also provided a 60-day warranty"; that the transaction's characterization as an "as is" brokerage sale was a "subsequent change in characterization" adopted only after the incident; and that Plaintiffs' conduct raised "potential misrepresentation and bad-faith concerns" warranting a "corporate investigation"; (c) in the September 29, 2026 email to, among others, Sea Tow and Engel & Völkers corporate recipients:

that "Engels and Volkers [sic] dropped this faulty boat in my lap and could care less" and that Plaintiffs are "a boat broker who is denying responsibility"; and (d) in the October 4, 2026 email to Engel & Völkers Yachting offices in Europe and Engel & Völkers corporate recipients (which forwarded the entire chain, including Berkowitz's October 3, 2026 email): that "the boat included a 60-day warranty"; that Plaintiffs were "refusing to honor [their] warranty, which was represented to [Berkowitz] as an Engel & Völkers warranty"; that Plaintiffs were "clearly trying any means possible to slip out of any liability"; that Plaintiffs "ha[ve] done nothing but act in bad faith throughout this entire transaction"; and the full text of the review described in Count III.

93. Each of these statements is false, for the reasons *supra*. The PSA is crystal clear in that no warranty was given, promised, or transferred; the Vessel was sold "as is" from the moment Berkowitz signed the PSA, not as the result of any "subsequent change in characterization"; and Plaintiffs have not concealed facts, acted negligently, or acted in bad faith. Berkowitz knew each statement was false when he made it.

94. The statements in the mass emails are defamatory *per se* because they accuse E & V Yachting and Mr. Benson of failing to honor a warranty, dishonesty, misrepresentation, bad faith, and concealment in the conduct of their business, impute to them conduct and characteristics incompatible with the proper exercise of their lawful business, trade, and profession, and tend to injure them in that trade and profession. Damages are therefore presumed as a matter of law.

95. The mass emails were calculated to cause maximum harm. Berkowitz did not merely complain to Plaintiffs; he directed his accusations to the leadership of the worldwide Engel & Völkers organization—from which E & V Yachting and Mr. Benson derive the right to operate under the Engel & Völkers name—and demanded that senior management "intervene," conduct an "independent review," and "investigate" Plaintiffs. *See* Ex. C.

96. Berkowitz sent most of the mass emails from his Arnold's email account (jay@arnoldsofficefurniture.com), under his signature block as Chief Executive Officer of Arnold's, and copied Arnold's personnel on the mass emails, including those he sent from his personal email account. Arnold's, acting through its Chief Executive Officer and its employees acting within the course and scope of their employment, authorized, directed, participated in, and ratified the publication of the mass emails, and is liable for them jointly and severally with Berkowitz.

97. Berkowitz and Arnold's published the mass emails with actual malice—with knowledge of the falsity of the False Statements or with reckless disregard for their truth or falsity—and, in any event, negligently. The Mass emails were the instrument of Berkowitz's threats described in paragraphs 42 through 49 above: they were sent to Engel & Völkers entities and to Sea Tow for the express purpose of injuring Plaintiffs' business and pressuring Plaintiffs to rescind the PSA, and Berkowitz continued to send them after Plaintiffs' counsel notified him in writing that his statements were false and defamatory.

98. The mass emails were directed into Florida, to Florida businesses (including Sea Tow's Sarasota office), and concern businesses and a business person located in, and doing business in, Sarasota County, Florida. Berkowitz's and Arnold's publication of the Mass emails therefore constitutes the commission of a tortious act within the State of Florida.

99. As a direct and proximate result of the mass emails, E & V Yachting and Mr. Benson have suffered, and continue to suffer, damages, including injury to their reputation and standing within the Engel & Völkers organization and the yacht brokerage industry, injury to their relationships with Engel & Völkers affiliates and with Sea Tow, loss of goodwill, loss of existing and prospective customers and brokerage opportunities, and the cost of responding to the inquiries

and concerns that the mass emails were designed to generate, in an amount to be proven at trial but in excess of $50,000.00.

100. All conditions precedent to the maintenance of this action have been performed, have occurred, or have been waived.

**WHEREFORE**, Plaintiffs, GG YACHTS INC., d/b/a Engel & Völkers Yachting, and PAUL BENSON, respectfully request that this Honorable Court enter judgment in their favor and against Defendants, JAY BERKOWITZ and ARNOLD'S OFFICE FURNITURE, LLC, jointly and severally, for defamation *per se*, awarding Plaintiffs their damages (including general damages presumed by law and all special damages proven at trial), pre-judgment and post-judgment interest, costs, and attorneys' fees as permitted by the PSA and applicable law, and granting such other relief as this Honorable Court deems proper and just.

**COUNT V – TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS**
(E & V Yachting and Mr. Benson Against Berkowitz and Arnold's Office Furniture, LLC)

101. Plaintiffs re-allege and reaffirm paragraphs 1 through 54 of the Complaint as if fully incorporated herein.

102. This is an action for tortious interference with advantageous business and contractual relationships against Berkowitz and Arnold's.

103. At all material times, E & V Yachting and Mr. Benson had existing, identifiable, advantageous business and contractual relationships under which they possessed legal rights, including the benefit of the Engel & Völkers brand's international goodwill; and E & V Yachting's referral relationships with other Engel & Völkers brokerages and yachting offices, including the Engel & Völkers Sarasota real estate office on whose Google Business Profile Berkowitz posted his review and the Engel & Völkers Yachting offices in Europe to which Berkowitz directed his Mass emails; and E & V Yachting's relationships with its existing clients and with identifiable prospective buyers and sellers of vessels with whom it was negotiating, or reasonably expected to

transact, during the period of Berkowitz's ongoing defamation campaign (which continues as of the filing of this Complaint).

104. Berkowitz and Arnold's had actual knowledge of each of these relationships and market factors. Berkowitz identified the Engel & Völkers organization's senior executives by name and title, addressed his Mass emails to them and to Engel & Völkers offices in the United States and Europe, expressly referred to E & V Yachting's "corporate Sea Tow membership," copied Sea Tow's manager and attorney on his communications, posted his review on the Google Business Profile of the Engel & Völkers Sarasota office, and stated his intention to reach "prospective customers" of E & V Yachting in every market in which Engel & Völkers Yachting operates. *See* Exs. B and C.

105. Berkowitz and Arnold's intentionally and unjustifiably interfered with these relationships by improper means, including: (a) publishing the False Statements directly to the Engel & Völkers organization's leadership and affiliates, to Sea Tow, and to the public; (b) demanding that the Engel & Völkers organization "intervene" against, "investigate," and conduct an "independent review" of E & V Yachting and Mr. Benson; (c) falsely misrepresenting to Sea Tow that Plaintiffs, rather than Berkowitz, are responsible for the salvage and storage charges on Berkowitz's Vessel, and warning Sea Tow and others that "everyone on this email will be named in this action either corporately, personally or both"; (d) posting a one-star review on the Google Business Profile of the Engel & Völkers Sarasota office—an office that had nothing to do with the transaction—thereby reducing that office's public rating to 1.0; (e) announcing and commencing a campaign to post the False Statements on sixty-five consumer-review listings across the United States and in every foreign market in which Engel & Völkers Yachting operates; and (f) using improper threats of the foregoing to coerce Plaintiffs into rescinding the PSA, as alleged *supra*.

106. Berkowitz's obnoxious interference was neither privileged nor justified. Berkowitz is a stranger to each of the relationships described above. His conduct was not a good-faith effort to protect a legitimate interest, because he had no right under the PSA or Florida law to the rescission and refund he sought to coerce, and because a party may not interfere with another's business relationships through false statements of fact and threats of reputational injury. The sole purpose of Berkowitz's conduct was to inflict economic harm (since Defendants had no legal leverage in light of the clear terms of the PSA) on Plaintiffs until they capitulated.

107. Arnold's, acting through its Chief Executive Officer and its employees, knowingly participated in the interference by furnishing the email systems and personnel through which the interference was carried out, and is liable jointly and severally with Berkowitz.

108. As a direct and proximate result of the interference, Plaintiffs' relationships with the Engel & Völkers organization and its affiliates and with Sea Tow have been damaged; E & V Yachting and Mr. Benson have been required to respond to, and defend themselves against, the inquiries and concerns that Berkowitz's communications were designed to generate; E & V Yachting has been exposed to claims by Sea Tow for charges that are Berkowitz's responsibility; and E & V Yachting has lost, and will continue to lose, prospective brokerage transactions and the goodwill upon which its business depends, all in an amount to be proven at trial but far in excess of $50,000.00.

109. Berkowitz's interference and malfeasance is continuing and, by his own account, expanding. Unless restrained, Berkowitz and Arnold's will continue to publish the False Statements to Plaintiffs' business relations and to the public, causing Plaintiffs irreparable harm for which there is no adequate remedy at law, as more fully alleged in Count VI below.

**WHEREFORE**, Plaintiffs, GG YACHTS INC., d/b/a Engel & Völkers Yachting, and PAUL BENSON, respectfully request that this Honorable Court enter judgment in their favor and

against Defendants, JAY BERKOWITZ and ARNOLD'S OFFICE FURNITURE, LLC, jointly and severally, for tortious interference with business relationships, awarding Plaintiffs their compensatory damages, pre-judgment and post-judgment interest, costs, and attorneys' fees as permitted by the PSA and applicable law, and granting such other relief as this Honorable Court deems proper and just.

**COUNT VI – TEMPORARY AND PERMANENT INJUNCTIVE RELIEF**

(E & V Yachting and Mr. Benson Against Berkowitz and Arnold's Office Furniture, LLC)

110. Plaintiffs re-allege and reaffirm paragraphs 1 through 54, and paragraphs 71 through 109 (Counts III, IV, and V), of the Complaint as if fully incorporated herein.

111. This is an action for temporary and permanent injunctive relief pursuant to the Florida Rules of Civil Procedure, including Rule 1.610 and this Court's inherent equitable powers, to restrain Defendants' ongoing and threatened publication of the blatantly False Statements in furtherance of their tortious interference with Plaintiffs' business relationships.

112. Plaintiffs have a clear legal right to the relief requested and a substantial likelihood of success on the merits. The falsity of the False Statements is established by the PSA itself—a document that Berkowitz signed, initialed on every page, and reaffirmed by written amendment—and Berkowitz's publication of the False Statements, his intent to injure Plaintiffs' business, and his use of that injury as leverage are documented in his own words. *See* Exs. A, B, and C.

113. Plaintiffs will suffer irreparable harm unless Defendants are enjoined. E & V Yachting's and Mr. Benson's business depends entirely on trust, reputation, and standing within the Engel & Völkers organization and the yachting public in general. Each additional publication of the False Statements compounds the injury to that reputation and goodwill, erodes the Engel & Völkers organization's confidence in Plaintiffs, and drives away prospective clients who, who will simply and silently choose another broker. Such losses are inherently incapable of precise measurement. Berkowitz has announced that the campaign is only beginning—sixty-five listings

in the United States, followed by every international market in which Engel & Völkers Yachting operates—and has refused to remove the reviews already posted.

114. Plaintiffs have no adequate remedy at law. Money damages cannot restore a reputation for honesty once it has been impugned in the eyes of the very organization and clientele upon which Plaintiffs depend, cannot quantify the prospective clients who never call, and cannot stop the continuing dissemination of the False Statements across dozens of platforms. Each new posting is a new publication that would require a new action, and Berkowitz has stated that "[t]ime is not an obstacle" and that he will spend "whatever [he has] to" in pursuing his campaign.

115. The injunctive relief requested will serve the public interest. The public has no legitimate interest in the dissemination of false statements of fact, and the federal Consumer Review Fairness Act—on which Berkowitz relies—protects only truthful reviews and expressly preserves actions for defamation. 15 U.S.C. § 45b(b)(2)(B). Enjoining demonstrably false factual assertions that are being used to extract a contractual concession to which the speaker is not entitled burdens no legitimate speech.

116. The injunctive relief sought is not a prior restraint on protected speech. The False Statements are not merely defamatory; they were published as the instrument of Defendants' tortious interference with Plaintiffs' identified business relationships, and as leverage to coerce Plaintiffs into rescinding the PSA. Florida law permits injunctive relief against defamatory statements made in furtherance of the commission of an intentional tort, including tortious interference with business relationships.

117. The relief requested is narrowly tailored. Plaintiffs do not seek to prevent Berkowitz from truthfully describing the events of September 11, 2026, from petitioning any court, or from communicating with his own counsel, insurers, or Sea Tow regarding his Vessel. Plaintiffs seek only to enjoin the publication and republication of the specific False Statements identified in

paragraph 50 above (and statements substantially similar to them), to require the removal of the existing postings containing them, and to prohibit the use of Arnold's personnel and resources to carry out the campaign.

118. Plaintiffs are prepared to post such bond as the Court deems appropriate pursuant to Florida Rule of Civil Procedure 1.610(b).

119. This Complaint is verified. Plaintiffs will separately move for a temporary injunction and respectfully request that the Court set an evidentiary hearing on that motion at the earliest available date.

**WHEREFORE**, Plaintiffs, GG YACHTS INC., d/b/a Engel & Völkers Yachting, and PAUL BENSON, respectfully request that this Honorable Court enter a temporary injunction and, upon final hearing, a permanent injunction:

(a) enjoining Defendants, JAY BERKOWITZ and ARNOLD'S OFFICE FURNITURE, LLC, and their officers, agents, servants, employees, and all persons in active concert or participation with them, from publishing or republishing, in any medium, the False Statements identified in the Complaint, or any statement substantially similar thereto, including any statement that Plaintiffs provided or promised a warranty on the Vessel, that Plaintiffs have refused to honor a warranty on the Vessel, that Plaintiffs recharacterized the transaction as an "as is" sale only after the September 11, 2026 incident, or that Plaintiffs knew of and concealed a defect in the Vessel;

(b) requiring Defendants, within five (5) days of the Court's order, to remove, or cause to be removed, every online review, post, or other publication authored by or on behalf of Berkowitz containing any of the False Statements, including the review attached as Exhibit B, and to file with the Court and serve on Plaintiffs a sworn certification of compliance identifying each platform on which such content was posted and removed;

(c) enjoining Defendants from sending any further communication containing the False Statements to any entity or office of the Engel & Völkers organization, to Sea Tow, or to any customer, client, or business relation of E & V Yachting;

(d) enjoining Defendants from using the personnel, email systems, or other resources of ARNOLD'S OFFICE FURNITURE, LLC to publish or disseminate the False Statements;

(e) requiring Defendants to preserve all documents, communications, photographs, video recordings, spreadsheets, and electronically stored information relating to the Vessel,

the transaction, the September 11, 2026 incident, the online reviews, and the Mass emails, including the "EV_Yachting_Review_Tracker" spreadsheet;

(f) awarding Plaintiffs their costs and reasonable attorneys' fees as permitted by the PSA and applicable law; and

(g) granting such other and further relief as this Honorable Court deems just and proper.

**COUNT VII – INJURIOUS FALSEHOOD**

(E & V Yachting Against Berkowitz and Arnold's — Pleaded in the Alternative)

120. Plaintiff E & V Yachting re-alleges and reaffirms paragraphs 1 through 54 of the Complaint as if fully incorporated herein.

121. This is an action for injurious falsehood (also known as trade libel or commercial disparagement), pleaded in the alternative to Counts III and IV pursuant to Florida Rule of Civil Procedure 1.110(g).

122. Berkowitz and Arnold's published the False Statements to third parties, including prospective customers of E & V Yachting, Engel & Völkers affiliates, and Sea Tow, through the online reviews attached as Exhibit B and the email attached as Exhibit C. The False Statements disparage the quality of E & V Yachting's services and of the vessels it brokers, asserting that E & V Yachting sells vessels with concealed, "life-threatening" defects, refuses to honor warranties it has given, and will not "stand behind" the vessels it sells and implies Plaintiffs are unethical.

123. The False Statements are false, as alleged in paragraphs 50 through 51 above, and Berkowitz and Arnold's knew that they were false, or acted in reckless disregard of their truth or falsity, when they published them.

124. Berkowitz and Arnold's knew, and intended, that the False Statements would induce others not to deal with E & V Yachting. That was their stated purpose: Berkowitz announced that he was publishing the False Statements "so that prospective customers can make informed decisions [based on the false information he supplied]," "to protect other consumers," and to warn "anyone considering doing business with Engel & Völkers Yachting / GG Yachts" to

"proceed with extreme caution," and he selected sixty-five consumer-review and consumer-information listings for that purpose. *See* Exs. B and C. In reality, it was a defamatory smear campaign built on blatant lies.

125. The False Statements played a material and substantial part in inducing others not to deal with E & V Yachting, and E & V Yachting has suffered special damages as a direct and proximate result, including the loss of prospective brokerage transactions and listings, the cost of corrective communications to Engel & Völkers affiliates and prospective customers (who have already received feedback from viewers of the false and defamatory reviews), and the expense of responding to the inquiries generated by the False Statements, in an amount to be proven at trial but well in excess of $50,000.00 (in addition to attorneys' fees and court costs).

126. Arnold's, acting through its Chief Executive Officer and its employees, authorized, directed, participated in, and ratified the publication of the False Statements, and is liable jointly and severally with Berkowitz.

**WHEREFORE**, Plaintiff, GG YACHTS INC., d/b/a Engel & Völkers Yachting, respectfully requests that this Honorable Court enter judgment in its favor and against Defendants, JAY BERKOWITZ and ARNOLD'S OFFICE FURNITURE, LLC, jointly and severally, for injurious falsehood, awarding E & V Yachting its damages, pre-judgment and post-judgment interest, costs, and attorneys' fees as permitted by the PSA and applicable law, and granting such other relief as this Honorable Court deems proper and just.

## **JURY TRIAL WAIVER, ATTORNEYS' FEES, AND RESERVATION OF RIGHTS**

127. Pursuant to Paragraph 16 of the PSA, Berkowitz, "having been advised to consult legal counsel," expressly "waive[d] trial by jury with respect to any claim relating to [the PSA], whether against each other or against the Broker as a third party beneficiary." Each of the claims

asserted herein relates to the PSA. Plaintiffs do not demand trial by jury and request that all claims be tried before the Court.

128. Plaintiffs have retained the undersigned counsel and are obligated to pay a reasonable fee for its services. Plaintiffs are entitled to recover their reasonable attorneys' fees and costs from Berkowitz pursuant to Paragraph 16 of the PSA, which provides that, "[s]hould Broker become a party to any litigation involving this Agreement, Broker shall be reimbursed for its costs and attorney's fees, at all pretrial, trial and appellate levels, by the party or parties found to have breached this Agreement."

129. Plaintiffs reserve the right to seek leave of Court to amend this Complaint to assert a claim for punitive damages against Defendants pursuant to section 768.72, Florida Statutes, upon a reasonable showing by evidence in the record or proffered by Plaintiffs.

**Verification**

Under penalties of perjury, I declare that I have read the foregoing, and the facts alleged are true, to the best of my knowledge and belief.

**GG YACHTS INC.**, d/b/a Engel & Völkers Yachting

Justin Cohen

By: ____________________________________

Name: Justin Cohen

Title: President

Date: Oct. 15_, 2026

__*/s/ Paul Benson*__________________________

**PAUL BENSON**, individually

Date: Oct. 15_, 2026

Respectfully submitted on this 15th day of October, 2026.

**BERLIN PATTEN EBLING, PLLC**
3700 South Tamiami Trial
Sarasota, Florida 34239
Tel: (941) 954-9991

*/s/ Michael J. Rutledge, Esq.*
Michael J. Rutledge, Esq.
Florida Bar No.: 1025657
mrutledge@berlinpatten.com
hshiffner@berlinpatten.com
*Attorney for Plaintiffs*

# EXHIBIT A

ENGEL & VÖLKERS
YACHTING

Engel & Völkers Yachting
417 Burns Court
Sarasota FL 34236
941-867-4299 (P)
www.evyachtsales.com

# PURCHASE AND SALE AGREEMENT

| Buyer / Seller | |
|---|---|
| Buyer: Jay Berkowitz | Seller: OWNER OF RECORD |
| Co-Buyer : | Co-Seller |

| Vessel Information | | |
|---|---|---|
| Make: Fishing Raptor | Vessel Name: | Official/Title No.: |
| Model: 390 Solarium | Hull No: FIS39034J223 | Reg No.: Place of Registration: |
| Year: 2023 Length: 39ft 0in | Engines: Mercury 400 Verado | Country / Flag: |
| Additional Units (Tenders, Toys, Trailers) | | |

| Agreement Terms | | |
|---|---|---|
| Offer Date: Jun 28, 2026 | Listing Broker: Engel & Völkers Yachting | Purchase Price: $225,000.00 USD |
| Seller Acceptance Date: Jun 30, 2026 | Selling Broker: Engel & Völkers Yachting | Less Deposit: $5,000.00 USD |
| Buyer Accept/Reject Date: Jul 10, 2026 | Trade-In Description: | Less Trade Allowance: |
| Closing Date: Jul 17, 2026 | Delivery Location: Sarasota, Florida | Net Cash Difference: $220,000.00 USD |
| Additional Terms: Subject to: Trial Run; Mechanical Inspection. Following Buyer's acceptance of the Vessel, Brokerage shall arrange, at Brokerage's or Seller's expense, for a standard professional detailing of the Vessel's topsides and interior by a commercially reasonable detailing provider selected by Brokerage. Buyer agrees to pay Brokerage a $500 Closing & Documentation Fee at closing. | | |

1. **Agreement** Buyer agrees to purchase and Seller agrees to sell, all right, title and interest to the Vessel on the terms and conditions as set forth herein (the "Agreement). Capitalized words herein refer to the items in the chart above unless otherwise defined herein. Listing Broker and Selling Broker shall be referred to herein as "Brokers." If there is a Trade Allowance, the terms and conditions of the trade-in will be governed by a Trade-In Vessel Addendum.

2. **Timeframe for Acceptance of Agreement; Deposit**. If this Agreement is not signed and delivered to all parties ("Execution") on or before the SELLER ACCEPTANCE date, this Agreement shall be ineffective and the Deposit(s) shall be returned to Buyer unless Buyer otherwise instructs the Selling Broker. Within three (3) business days following Seller's execution of this Agreement, Buyer shall pay the Deposit to the Selling Broker's escrow account (as acknowledged below) as a deposit toward the Purchase Price to be held subject to the terms of this Agreement. Seller's obligations are not binding until the Deposit clears Selling Broker's account.

3. **Survey Option; Acceptance of Vessel; Conditions of Survey**. Buyer's obligation to purchase is subject to Buyer's satisfaction, in Buyer's sole discretion, with a trial run and survey of the Vessel, if Buyer elects to have the Vessel surveyed. In such event: (a) Buyer will select the Surveyor and thereupon Surveyor and not Brokers, will be the sole party responsible for any errors or omissions with respect to such survey, notwithstanding the fact that Brokers may have provided information and assisted Buyer with hiring the Surveyor; (b) *the survey shall be completed as soon as practicable after Execution*; (c) all costs of the survey are the Buyer's sole responsibility, including associated costs such as haul-out, dry dock charges, and

**Initials Buyer(s):** JB, ________ **Initials Seller(s)** PB, ________

subcontractors, for example; (d) Buyer and its surveyor will be solely responsible for the scope of the survey and the trial run with respect to determining conformity with the Buyer's requirements; and (e) Buyer must deliver written notice of rejection or acceptance to Seller by no later than the BUYER ACCEPT/REJECT date. ***Buyer's failure to timely accept/reject shall be construed as a rejection.*** Upon Buyer's acceptance, and/or initiation of survey, Seller will not make any personal use of the Vessel pending Closing. If Buyer rejects the Vessel, after all expenses incurred on Buyer's behalf have been paid: (i) the Agreement shall terminate; (ii) the parties and Brokers will be released from any further liability hereunder; and (iii) the Deposit shall be returned to Buyer. The trial run shall be at Seller's sole risk and expense. Brokers shall not be responsible for the cost of correcting any items found to be deficient in the survey.

4. **Closing**. Closing shall occur on or before the CLOSING DATE, or at such other time as may be agreed by the parties in writing. Seller shall deliver the Vessel at the Sarasota, Florida (if blank, at Listing Agent's principal place of business) together with all gear, machinery, equipment and all other articles and appurtenances on board the Vessel as of the date of signature of this Agreement by the Buyer ("Items"), except for those Items included in a written exclusion list ("Exclusion List") delivered to Buyer within two (2) days of Execution, but in no event later than Closing. If unacceptable, Buyer shall then have two (2) business days from receipt of the Exclusion List (but in no event later than Closing) to deliver, at Buyer's option, written notice of termination of this Agreement to Seller. In such event, after all expenses incurred in on Buyer's behalf have been paid, (i) the Agreement shall terminate, (ii) the parties and Brokers will be released from any further liability hereunder, and (iii) the Deposit shall be returned to Buyer. Buyer's failure to deliver timely notice of termination will constitute Buyer's acceptance of the Exclusion List. Seller shall deliver to Brokers all necessary documents for transfer of title to Buyer on or before the Closing Date. Final payment due at the time of Closing shall be in the form of cleared funds. The preferred and accepted manner is for final payment by bank-to-bank wire transfer. Any other form of payment must be made early enough to allow funds to be cleared on or before the Closing Date. Any funds due Broker(s) for storage, insurance, repairs and/or other items accrued to the Seller's account shall be deducted from the Seller's net proceeds prior to disbursement of funds to Seller.

5. **Brokers**. The parties acknowledge that the SELLING BROKER agency and the LISTING BROKER agency are the only brokers procuring this Agreement. The term "Broker" as used herein refers to the Selling Agency and Listing Agency, collectively. Notwithstanding that only one party may be responsible for payment of Brokers' fees, the parties agree that the Listing Agency is agent for the Seller only (and owes no fiduciary responsibilities to the Buyer) and the Selling Agency is agent only for the Buyer (and owes no fiduciary responsibility to the Seller). Notwithstanding the foregoing, if a Broker is both the Listing Agency and Selling Agency, the parties consent to Broker acting as a dual-agent in this transaction for both Buyer and Seller, and Broker shall perform only the duties expressly set forth herein and no implied duties or obligations shall be read into the Agreement. The parties further agree that Broker may disclose to both parties facts known to Broker materially affecting the Vessel's value or desirability. Broker shall not, without Owner's consent, disclose to Buyer that Seller is willing to sell the Vessel for an amount less than the asking price. The parties each represent and warrant that neither has employed or dealt with any broker, agent or finder in carrying out the negotiations relating to the sale of the Vessel to Buyer and acknowledge that Broker is a third-party beneficiary to this Agreement.

6. **Seller's Representations; Requirements for Closing**. Seller represents and warrants that: (a) the Vessel is being conveyed free and clear of all debts, claims, maritime or common law liens, security interests, encumbrances, excise taxes, and any other applicable taxes, customs' duties, or tariffs due of any state, country, regulatory and/or taxing authority of any kind whatsoever (collectively, "Encumbrances"); and (b) Seller has good and marketable title to the Vessel, which Seller will warrant and defend. By the Closing Date, Seller shall deliver to Buyer: (i) satisfactory evidence of title; (ii) proof of payment/removal of all Encumbrances, if any; (iii) a personal guaranty and indemnification from the Seller (or the beneficial owner(s) of the Seller if Seller is a corporate entity) guaranteeing Seller's representations and warranties in (a) and (b) above; and (iv) any other necessary documents for transfer of good and marketable title to the Buyer. Seller shall pay any cost associated with, and shall cooperate fully to obtain, any authorization for sale as may be required from any governing authority. Any party which is a corporate entity will provide to the other prior to Closing (x) proof that it is in good standing under the laws of the State under which the entity has been formed, (y) a consent action or resolution demonstrating the entity's duly authorized decision to purchase or sell the Vessel, and (z) a power of attorney demonstrating the authority of the individual accepting the Vessel and/or executing the Agreement and/or purchase and sales documents.

7. **Risk of Loss; *Force Majeure***. Risk of loss, damage or destruction to the Vessel shall be Seller's prior to delivery of the Vessel. The Closing Date is subject to the non-occurrence of *force majeure* events such as, without limitation, war, terrorism acts, strikes, accidents, tropical storms, hurricanes, natural disasters, or any other causes beyond Seller's control ("*Force Majeure*"). If a *Force Majeure* event occurs or the Vessel is otherwise damaged, the Closing Date (and all time periods referred to in this Agreement) shall be deemed extended by the time necessary to deliver the Vessel in the same condition as it existed on the date of Execution. However, if (a) the *Force Majeure* or damage to the Vessel delays the Closing Date for a period of at least thirty days or (b) if the *Force Majeure* or damage requires repairs in excess of five percent of the Purchase Price (5%)

**Initials Buyer(s):** JB, ______ **Initials Seller(s)** PB, ______

then (i) this Agreement will be deemed terminated, (ii) the respective rights and obligations of each party will cease to exist and be of no further force and effect, (iii) Buyer's Deposit(s) will be returned to Buyer after all expenses incurred by Seller or Broker on Buyer's behalf have been paid, and (iv) neither party will be entitled to, and hereby waives, any claim for specific performance, damages, compensation, interest, or any other claims.

8. **Default**. In the event the Closing is not consummated due to Buyer's non-performance, including but not limited to failure to pay monies due or execute all documents necessary for completion of the purchase by the Closing Date, all Deposit funds paid prior to Closing shall be retained by the Seller and Broker as liquidated and agreed damages, in full settlement of all claims between the parties, and the parties shall be relieved of all obligations under this Agreement. Buyer and Seller agree that the deposited funds shall be divided equally between the Seller and the Brokers, except that Brokers' share shall not exceed any commission due Brokers had a sale been consummated. Brokers shall then divide in the same proportions as the commission would have been divided had a sale been consummated. If Closing is not consummated due to Seller's non-performance, all money paid or deposited pursuant to this Agreement by the Buyer shall be returned to the Buyer upon demand, or the Buyer shall have the right of specific performance. Seller agrees that specific performance is reasonable in light of the uniqueness of the Vessel, difficulty of proof of loss, and the inconvenience or non-feasibility of otherwise obtaining an adequate remedy. On Seller's default the Seller shall forthwith pay Broker the full commission provided for by the listing agreement.

9. **Sales, Use, and Property Taxes**. Sales or use taxes, if applicable on this purchase, are the responsibility of the Buyer. Buyer hereby indemnifies Seller and Broker for the payment of same. As per this Agreement, Property tax is the responsibility of the Owner of Record on January 1st of any given year. This contract does not implement any prorating of Property Tax, unless otherwise stated in ADDITIONAL TERMS. Seller and Buyer are advised to take this into account when agreeing on the terms of purchase.

10. **REPRESENTATIONS AND WARRANTIES**. SELLER AND THE BROKERS BELIEVE THAT ANY INFORMATION ANY OF THEM HAS PROVIDED ON THE VESSEL IS GOOD AND CORRECT AND OFFER THE INFORMATION IN GOOD FAITH, BUT DO NOT AND CANNOT GUARANTEE THE ACCURACY OF THE INFORMATION. BUYER WARRANTS AND REPRESENTS THAT HE IS NOT RELYING ON ANY ADVERTISEMENTS, PROMISES, DESCRIPTIONS, AFFIRMATIONS, OR REPRESENTATIONS (WHETHER ORAL OR WRITTEN, PRIOR TO OR CONTEMPORANEOUS WITH THIS AGREEMENT) PROVIDED BY THE BROKER. UPON CLOSING, IT IS UNDERSTOOD THAT THE BUYER HAS ACCEPTED THE VESSEL IN ITS ***"AS IS"*** CONDITION. NO WARRANTY, EITHER EXPRESS OR IMPLIED, AND NO REPRESENTATION AS TO THE CONDITION OF SAID VESSEL, ITS FITNESS FOR ANY PARTICULAR USE OR MERCHANTABILITY, HAS BEEN GIVEN OR IS BINDING UPON BROKER, *ALL OF WHICH ARE DISCLAIMED*.

11. **Financing**. Buyer's obligations are not contingent upon Buyer obtaining financing, unless otherwise stated in ADDITIONAL TERMS. Buyer represents that it will arrange financing, if necessary. Buyer acknowledges that Broker(s) has made no representations or warranties with respect to Buyer's ability to obtain financing, Buyer's qualifications to obtain any type of mortgage on the Vessel, or Buyer's ability to document the Vessel so that it is a "vessel of the United States" for purposes of the Ship Mortgage Act. 46 U.S.C. 911 et seq.

12. **Counterparts**. This Agreement may be signed in any number of identical counterparts, each of which will be an original (including signatures delivered via facsimile or electronic mail) with the same effect as if the signatures were upon the same instrument.

13. **Binding Effect; Contemporaneous Contracts; Future Sales**. This Agreement is binding on all parties, their heirs, personal representatives and/or assigns. Seller shall not sell the Vessel or enter into any contract for the sale of same while this Agreement is in effect. If a sale is not consummated per the terms of this Agreement, and the Buyer and Seller enter into a contract between themselves within two years after this Agreement is terminated for the transfer of ownership of the Vessel, the Seller agrees to pay the Broker an amount identical to the commission the Broker would receive under the terms of the listing contract.

14. **Transferred Warranties**. No warranties are transferred to Buyer unless listed in this section and attached hereto. Any costs associated with such transfers shall be Buyer's. Seller's transfer of its interest in such warranties is subject to the condition that neither Seller nor Broker makes any representation concerning such warranties and that the warranties transferred are subject to the terms thereof.

15. **Escrowed Funds**. The parties acknowledge that: (a) Broker shall not be responsible for the Deposit until the funds have cleared into Broker's account; (b) the Selling Broker shall hold the Deposit as an escrow agent once the funds have cleared and any other funds received by either Broker from any party will be held in trust for that party; (c) Broker may retain applicable commission prior to disbursement of the balance due to Seller; and (d) in any dispute involving any such funds held by Broker, Broker shall be indemnified for legal fees and costs relating in any way to such dispute, including those incurred in any appeals

**Initials Buyer(s):** JB, ________ **Initials Seller(s)** PB, ________

(which obligation is secured by a lien in the escrowed funds) and those relating to its claim for a commission, unless Broker is found, in a final unappealable judgment, to have engaged in willful misconduct or acted with gross negligence.

16. **Miscellaneous**. Notwithstanding anything herein to the contrary, this Agreement, including its exhibits and schedules, is the entire agreement between the parties pertaining to the subject matter hereof and supersedes all prior and contemporaneous negotiations, agreements, representations, warranties, and understandings pertaining thereto, be it written, oral, or otherwise. Buyer and Seller hereby jointly and severally indemnify and hold the Broker harmless from any and all third party claims, demands, causes of action, losses, liabilities, damages and judgments, arising in connection with the Broker's undertaking pursuant to the terms and conditions of this Agreement. Should Broker become a party to any litigation involving this Agreement, Broker shall be reimbursed for its costs and attorney's fees, at all pretrial, trial and appellate levels, by the party or parties found to have breached this Agreement. If any term, condition, or provision of this Agreement is held to be unenforceable for any reason, it shall, if possible, be interpreted to achieve the intent of the parties to this Agreement to the extent possible rather than avoided. In any event, all other terms, conditions and provisions of this Agreement shall be deemed valid and enforceable. It is understood that there are no other duties, obligations, liabilities, or warranties, implied or otherwise, except as set forth herein. This Agreement may not be amended or modified, except in writing, signed by both parties. Notice and delivery given by or to the attorney or broker representing any party shall be as effective as if given by or to that party. All notices must be in writing and may be made by mail, telefax, email or personal delivery, but proof of delivery shall be required for such to be effective. Unless otherwise provided for herein, Buyer may not assign this Agreement without Seller's consent, which consent shall not be unreasonably withheld. No claim or right arising out of this Agreement can be waived or discharged by one party, in whole or in part, unless in writing, nor shall any waiver be applicable except in the specific instance for which it is given. Any proceeding relating to this Agreement will be brought in the courts of the state and county of the main office of the Selling Broker, and each of the parties irrevocably submits to the exclusive jurisdiction of each such court, waives any objection it may now or hereafter have to venue or to convenience of forum, and agrees not to bring any proceeding relating to this Agreement in any other court. The Additional Terms in the info box above shall be incorporated herein.
***The parties, having been advised to consult legal counsel with respect to this Agreement hereby waive trial by jury with respect to any claim relating to this Agreement, whether against each other or against the Broker as a third party beneficiary*.**

| **BUYER(S)** | | **SELLER(S)** | |
|---|---|---|---|
| Signature: | Jay Berkowitz | Signature: | Paul Benson |
| Print Name: | Jay Berkowitz | Print Name: | OWNER OF RECORD |
| Date: | 11:07 PM GMT-04:00<br>Jun 28, 2026 | Date: | 07:45 AM GMT-06:00<br>Jun 29, 2026 |
| Signature: | | Signature: | |
| Print Name: | | Print Name: | |
| Date: | | Date: | |

**SELLING BROKER: Acknowledgement and receipt of deposit**

| | | | |
|---|---|---|---|
| Signature: | Justin Cohen | Date: | 09:11 AM GMT-04:00<br>Jul 01, 2026 |
| Print Name: | Justin Cohen | Amount: | $5,000.00 USD |

THIS AGREEMENT IS NOT BINDING UNTIL SIGNED BY BOTH PARTIES AND DEPOSIT FUNDS HAVE BEEN RECEIVED AND CLEARED INTO BROKER'S ESCROW ACCOUNT

Use of this form is and does not constitute the provision of legal services by Yacht Closer LLC. User understands and agrees that Yacht Closer LLC is not a law firm. Yacht Closer LLC encourages you to seek the advice of an attorney regarding your specific legal situation. Use of this form is "AS IS" and Yacht Closer LLC disclaims all implied warranties, including the implied warranties of merchantability and fitness for a particular purpose.

**Initials Buyer(s):** JB, ________ **Initials Seller(s)** PB, ________

BoldSign Document ID: 5b71eeb4-e7b5-4cbe-85a9-3ae40c50c7c6


**Engel & Völkers Yachting**
417 Burns Court
Sarasota FL 34236
941-867-4299 (P)

# Amendment to Purchase and Sale Agreement

This agreement serves as an Amendment to the Purchase & Sale Agreement dated Jun 28, 2026, between Jay Berkowitz (Buyer) and OWNER OF RECORD (Seller), concerning the vessel 2023 Fishing Raptor 390 Solarium.

IT IS AGREED BETWEEN THE BUYER AND SELLER AS FOLLOWS:

Buyer(s) and Seller(s) Agree to amend the dates as follows:

Acceptance of Vessel Date on our before:
August 13, 2026

Closing Date Date on or before:
August 20, 2026

ALL OTHER TERMS AND CONDITIONS OF SAID AGREEMENT REMAIN UNCHANGED.

Agreed and Accepted by:

| | | | | | |
|---|---|---|---|---|---|
| Buyer: | Jay Berkowitz | Signature: | Jay Berkowitz | Date: | 06:57 PM GMT-04:00 Aug 12, 2026 |
| Co-Buyer: | | Signature: | | Date: | |
| Seller: | OWNER OF RECORD | Signature: | Justin Cohen | Date: | 09/11/2026 |
| Co-Seller: | | Signature: | | Date: | |

# EXHIBIT B

# Engel & Völkers Sarasota

22 S Links Ave #201, Sarasota, FL 34236, United States

Write a review

1.0 ★★★★★ 1 reviews ⓘ

Sort by

Most relevant | Newest | Highest rating | Lowest rating

**Jay Berkowitz**
14 reviews · 4 photos

★★★★★ 3 weeks ago New

My Experience With Engel & Völkers Yachting / GG Yachts

I purchased a Raptor 390 Solarium from Engel & Völkers Yachting / GG Yachts in Sarasota, Florida. I was repeatedly told I was purchasing a new demo boat, was provided the manufacturer's certificate of origin, and was to be the first title holder. Engel & Völkers Yachting / GG Yachts also provided a warranty.

Within minutes of taking delivery and fueling the boat, we smelled gasoline. We stopped and discovered approximately 8 inches of gasoline in the bilge, extending from the stern toward the forward cabin area. Everything beneath the floor appeared soaked with gasoline. We were instructed by the coast guard to drop anchor, shut down, put on life jackets and abandon ship. Sea Tow responded quickly and removed us from the boat and handled the emergency removal and extensive salvage operation which took over 6 hours.

The president of Engel & Völkers Yachting / GG Yachts was aboard with me and personally witnessed the entire incident.

Since then, I have received contradictory explanations from Engel & Völkers Yachting / GG Yachts and CEO Paul Benson. I was originally told by their representative that this was a new/demo boat under warranty. They provided manufacturers certificate of origin as first title holder. Then I was subsequently told by there Engles and Volkers CEO Paul Benson that it was a used boat sold "as is. A complete contradiction of facts based upon the representations and documentation provided to me when I

purchased the vessel.

The vessel was delivered to me with an extremely serious and potentially life-threatening fuel leak condition. Given the amount of gasoline we discovered aboard the vessel, I am extremely grateful that neither I nor the company president who was aboard with me was injured or killed in an explosion.

I have repeatedly asked Paul Benson, CEO of GG Yachts, to take the vessel back, assume responsibility for dealing with the condition and return my purchase funds. Mr. Benson has refused my requests. I am also facing a Sea Tow rescue and salvage bill exceeding $50,000.

The president of Engel & Völkers Yachting / GG Yachts, who was aboard with me when this occurred, apologized profusely and told me they would pay the charges and make the situation right. To date, however, Engel & Völkers Yachting / GG Yachts has not agreed to take the vessel back or return my purchase funds or take control of the situation at all. In fact their CEO Paul Benson has repeatedly told me it's my problem not theirs.

There is simply no way I would put my children or grandchildren aboard this boat after what occurred.

I have photographs, videos, Coast Guard involvement, Sea Tow records and extensive correspondence documenting my experience.

Based on my experience, I strongly recommend that anyone considering doing business with Engel & Völkers Yachting / GG Yachts proceed with extreme caution. When this serious problem arose immediately after delivery, my requests for the company to take the vessel back and return my funds were refused. In my experience, Engel & Völkers Yachting / GG Yachts and its CEO have not stood behind the

vessel or the Engel & Völkers brand.

The matter remains unresolved. I will update this review if that changes.



Hover to react




ENGEL & VÖLKERS - Updated ( ×

yelp.com/biz/engel-and-völkers-saint-petersburg?osq=Engel+%26+Völkers

**Jay B.**
Collingswood, NJ
7 2 0

Oct 5, 2026

Purchase and Representations

I purchased a Raptor 390 Solarium from Engel & Völkers Yachting / GG Yachts in Sarasota, Florida, for $225,000. Before and at the time of purchase, I was told that the boat was new or a demo boat, that I would be the first title holder, and that the boat included a 60-day warranty. I was provided the Manufacturer's Certificate of Origin.

September 11, 2026 -- Fuel Leak and Emergency

Shortly after taking possession of the boat on September 11, 2026, I fueled it in Sarasota. Within minutes, we smelled gasoline. We stopped the vessel and discovered a substantial amount of gasoline in the bilge. At one point, I observed approximately eight inches of gasoline in portions of the bilge, extending from the stern toward the forward cabin area.

Justin Cohen, president of Engel & Völkers Yachting / GG Yachts, was aboard and witnessed the incident.

The Coast Guard became involved and instructed us to shut down the vessel, drop anchor, put on life jackets, and abandon the boat. Sea Tow responded, removed us from the vessel, and conducted an emergency salvage operation lasting more than six hours.

Based on what I personally observed, this was a serious and potentially life-threatening fuel emergency, not a minor mechanical issue. During the incident, Coast Guard personnel told us that we were very lucky to be alive.

Statements Made During the Emergency

During the emergency, Mr. Cohen apologized and told me that Engel & Völkers would take care of the situation, including the charges, cleanup, and remediation. I have video documenting statements made during the incident.

Post-Sale Dispute

Since September 11, I have repeatedly asked Engel & Völkers Yachting / GG Yachts to take the vessel back, assume responsibility for its condition, and refund the $225,000 purchase price. Those requests have been refused.

I also received post-sale explanations that I believe conflict with the representations made before and at delivery. I was initially told that the boat was new or a demo boat, that I would be the first title holder, and that it included a 60-day warranty. I was later told by CEO Paul Benson that the vessel was used and sold "as is." I am also facing a Sea Tow rescue and salvage bill exceeding $50,000 related to the incident.

Documentation and Current Status

I have photographs, videos, Coast Guard-related information, Sea Tow records, emails, and other correspondence documenting the events and subsequent communications.

After experiencing a major fuel leak shortly after taking possession of the vessel, I would not place my children, grandchildren, or other family members aboard it.

This review describes my personal experience and understanding of the events of September 11, 2026. I am sharing it so that prospective customers can make informed decisions.

Based on my experience, I recommend that anyone considering doing business with Engel & Völkers Yachting / GG Yachts proceed with caution and carefully document all representations, warranty terms, vessel condition, and post-sale communications.

The dispute remains unresolved. I will update this review if the matter is resolved or if material new information becomes available.

Helpful 0 Thanks 0 Love this 0 Oh no 0

Engel & Volkers Yachting Review:

https://www.complaintsboard.com/engel-volker-yachting-horrible-boat-purchasing...

Not syncing | Update ··· | Chat

COMPLAINTS BOARD RESOLVING SINCE 2004 | Searc | Categories | Log in | For Business | Write a review | File a complaint

Convert with Wave
Download Now
DOWNLOAD

CB › Boats and Watercraft › Engel & Volkers Yachting › Complaints #2-21

# **Engel & Volkers Yachting review:** Horrible boat purchasing experience

**Ln5MZY@xz5B5@T3** of US
Oct 06, 2026 | 2:17 pm UTC | Verified customer

★☆☆☆☆ Featured review

Purchase and Representations

I purchased a Raptor 390 Solarium from Engel & Völkers Yachting / GG Yachts in Sarasota, Florida, for $225,000. Before and at the time of purchase, I was told that the boat was new or a demo boat, that I would be the first title holder, and that the boat included a 60-day warranty. I was provided the Manufacturer's Certificate of Origin.

September 11, 2026 — Fuel Leak and Emergency

Shortly after taking possession of the boat on September 11, 2026, I fueled it in Sarasota. Within minutes, we smelled gasoline. We stopped the vessel and discovered a substantial amount of gasoline in the bilge. At one point, I observed approximately eight inches of gasoline in portions of the bilge, extending from the stern toward the forward cabin area.

Justin Cohen, president of Engel & Völkers Yachting / GG Yachts, was aboard and witnessed the incident.

The Coast Guard became involved and instructed us to shut down the vessel, drop anchor, put on life jackets, and abandon the boat. Sea Tow responded, removed us from the vessel, and conducted an emergency salvage operation lasting more than six hours.

Based on what I personally observed, this was a serious and potentially life-threatening fuel emergency, not a minor mechanical issue. During the incident, Coast Guard personnel told us that we were very lucky to be alive.

Statements Made During the Emergency

During the emergency, Mr. Cohen apologized and told me that Engel & Völkers would take care of the situation, including the charges, cleanup, and remediation. I have video documenting statements made during the incident.

Post-Sale Dispute

Since September 11, I have repeatedly asked Engel & Völkers Yachting / GG Yachts to take the vessel back, assume responsibility for its condition, and refund the $225,000 purchase price. Those requests have been refused.

I also received post-sale explanations that I believe conflict with the representations made before and at delivery. I was initially told that the boat was new or a demo boat, that I would be the first title holder, and that it included a 60-day warranty. I was later told by CEO Paul Benson that the vessel was used and sold "as is."

I am also facing a Sea Tow rescue and salvage bill exceeding $50,000 related to the incident.

Documentation and Current Status

I have photographs, videos, Coast Guard-related information, Sea Tow records, emails, and other correspondence documenting the events and subsequent communications.

After experiencing a major fuel leak shortly after taking possession of the vessel, I would not place my children, grandchildren, or other family members aboard it.

This review describes my personal experience and understanding of the events of September 11, 2026. I am sharing it so that prospective customers can make informed decisions.

Based on my experience, I recommend that anyone considering doing business with Engel & Völkers Yachting / GG Yachts proceed with caution and carefully document all representations, warranty terms, vessel condition, and post-sale communications.

The dispute remains unresolved. I will update this review if the matter is resolved or if material new information becomes available.

# EXHIBIT C

| | |
|---|---|
| **From:** | Jay Berkowitz <jayberk57@gmail.com> |
| **Sent:** | Sunday, October 4, 2026 2:08 AM |
| **To:** | Jay Berkowitz |
| **Cc:** | Michael J. Rutledge, Esq.; infoeurope@evyachting.com; bodrum.yachting@engelvoelkers.com; portomontenegro@engelvoelkers.com; frenchrivierayachting@engelvoelkers.com; contact@engelvoelkers.com; till-fabian.zalewski@engelvoelkers.com; info@evyachting.com; harry.peralta@engelvoelkers.com; Inigo.Nicholson@engelvoelkers.com; Haver.Tanbay@engelvoelkers.com; legal@evrealestate.com; Justin Cohen; Paul Benson; David Cohen; Daniel Dugan; Kyra Connelly; Dan McDevitt; Christine Winsor |
| **Subject:** | Reviews to be posted starting Monday morning across the entire USA |
| **Attachments:** | EV_Yachting_Review_Tracker_Full list .xlsx |

Hello EV Associates,

Beginning Monday morning, we intend to start posting our documented review on the 65 review and consumer-information listings we have identified in the United States. The purpose is to inform prospective customers about our experience with Engel & Völkers Yachting following the serious and potentially life-threatening fuel emergency that occurred on September 11, 2026.

A complete list of the cities and review sites is provided below, and I have attached the spreadsheet that my team will use to track the postings.

We also intend to identify the appropriate review platforms associated with Engel & Völkers Yachting offices internationally and make our experience available to consumers in those markets as well.

Every review will be limited to our actual experience and the facts and representations that we can document through photographs, videos, emails, correspondence, Coast Guard-related information, Sea Tow records, and other records in our possession.

If this matter is resolved, we will promptly and accurately update the reviews to reflect that resolution.

Jay Berkowitz

Sarasota

Newport Beach

Sausalito

Annapolis

Naples

REVIEW SITES

Google

Yelp

BBB

Trustpilot

Facebook

ConsumerAffairs

Sitejabber

PissedConsumer

ComplaintsBoard USA Yachting

The Hull Truth

Cruisers Forum

YachtWorld consumer reviews

Florida Yacht & Ship Broker complaint information bureau

"My right to publish truthful reviews concerning my experience is protected under the federal Consumer Review Fairness Act of 2016, 15 U.S.C. § 45b."

REVIEW TO BE POSTED

MY EXPERIENCE WITH ENGEL & VÖLKERS YACHTING / GG YACHTS — SEPTEMBER 11, 2026

Purchase and Representations

I purchased a Raptor 390 Solarium from Engel & Völkers Yachting / GG Yachts in Sarasota, Florida, for $225,000. Before and at the time of purchase, I was told that the boat was a new demo boat, that I would be the first title holder, and that the boat included a 60-day warranty. I was provided the Manufacturer's Certificate of Origin.

September 11, 2026 — Fuel Leak and Emergency

Shortly after taking possession of the boat on September 11, 2026, I fueled it in Sarasota. Within minutes, we smelled gasoline. We stopped the vessel and discovered a substantial amount of gasoline in the bilge. At one point, I observed approximately eight inches of gasoline in portions of the bilge, extending from the stern toward the forward cabin area.

Justin Cohen, president of Engel & Völkers Yachting / GG Yachts, was aboard and witnessed the incident.

The Coast Guard became involved and instructed us to shut down the vessel, drop anchor, put on life jackets, and abandon the boat. Sea Tow responded, removed us from the vessel, and conducted an emergency salvage operation lasting more than six hours.

This was a serious and potentially life-threatening fuel emergency, not a minor mechanical issue. During the incident, Coast Guard personnel told us that we were very lucky to be alive as the vessel could have easily exploded as that have witnessed many times.

Statements Made During the Emergency

During the emergency, Mr. Cohen apologized and told me that Engel & Völkers would take care of the situation, including the charges, cleanup, and remediation. I have video documenting statements made during the incident.

Post-Sale Dispute

Since September 11, I have repeatedly asked Engel & Völkers Yachting / GG Yachts to take the vessel back, assume responsibility for its condition and these requests have been refused.

I also received post-sale explanations that conflict with the representations made before and at delivery. I was initially told that the boat was a new demo boat, that I would be the first title holder, and that it included a 60-day warranty. I was later told by CEO Paul Benson that the vessel was used and sold "as is."

I am also facing a Sea Tow rescue and salvage bill potentially exceeding $50,000 related to the incident.

Documentation and Current Status

I have photographs, videos, Coast Guard-related information, Sea Tow records, emails, and other correspondence documenting the events and subsequent communications.

After experiencing a major fuel leak shortly after taking possession of the vessel, I would not place my children, grandchildren, or other family members aboard under any circumstances.

I hired a forensic marine surveyor who explained that a large quantity of fuel filling the bilge can penetrate into the cracks and crevices resulting in damage to the polyethylene floatation foam and the mixture can create a dangerous toxic compound which would also have to be remediated before the vessel can ever be used. This expense is potentially as much as the cost of the boat.

The vessel was clearly delivered to me with a major defective breach of the fuel system which was confirmed by the president of the company with me on the boat on Sept 11 2026 yet the company Engle and Volkers refuses to take any responsibility and has left me hanging with this entire disaster.

This review describes my personal experience and understanding of the events of September 11, 2026. I am sharing it so that prospective customers can make informed decisions.

Based on my experience, I recommend that anyone considering doing business with Engel & Völkers Yachting / GG Yachts proceed with caution and carefully document all representations, warranty terms, vessel condition, and post-sale communications.

The dispute remains unresolved. I will update this review if the matter is resolved or if material new information becomes available.